AMERICAN GENERAL FINANCE,
INC., Appellant,

v.

Tyrone H. DICKERSON and Darlene
H. Dickerson, Appellees.

No. 5:97–CV–703–1(DF).

United States District Court,
M.D. Georgia,
Macon Division.

Jan. 27, 1999.

Larry W. Johnson, Mr., Atlanta, GA, for American General Finance, Inc.

Don E. Snow, Thomaston, GA, for Tyrone H. Dickerson and Darlene H. Dickerson.

FITZPATRICK, Chief Judge.

Before the Court is an appeal by American General Finance, Inc. from the August 29, 1997 order by the United States Bankruptcy Court for the Middle District of Georgia (Hershner, J.). For the reasons stated herein, the Bankruptcy Court's order is reversed.

## BACKGROUND

Tyrone and Darlene Dickerson ("the debtors"), Appellees herein, purchased a parcel of land in Thomaston, Georgia, on which their principal residence is located, in June 1985. They financed the purchase of the home with a loan from Rural Development, formerly known as Farmers Home Administration ("FHA"), in the amount of $38,150. FHA holds a first mortgage on the property by virtue of a security deed. In February 1996, the debtors obtained a loan from American General ("AG"), Appellants herein, in the amount of $20,000, based on the payoff of the first mortgage of $14,558; the debtors granted a security interest in their personal residence in favor of AG, which AG properly perfected.

On September 27, 1996, the debtors filed for relief under Chapter 13 of the Bankruptcy Code. At that time, the debtors were current with their payments to both FHA and AG. The debtors' Chapter 13 plan proposed to make the regular monthly payments to both FHA and AG outside of their Chapter 13 plan. On October 31, 1996, FHA filed a proof of claim in the amount of $59,889.74,[1]

---

1. The original amount that FHA loaned to the debtors was $38,150 with an interest rate of 11 3/8 % per year. Because of government subsidization, the debtors' monthly payment was only

$163.00; thus, although interest on the loan was accruing at a rate of over $4,000 per year, the debtors were only paying less than $2,000 per year. Therefore, the amount of the debt in-

and on November 13, 1996, AG filed a proof of claim in the amount of $21,432.06.

On January 31, 1997, the debtors filed a complaint against AG seeking to change the status of AG's claim from secured to unsecured. A trial was held on August 27, 1997, before Judge Hershner. Judge Hershner found that the proof of claim filed by FHA was accurate. While he did not determine the actual value of the debtors' residence, he determined that the highest possible value was $56,000, the highest value offered at trial. Using the amount that the debtors owed to FHA and the highest possible value of the property, he determined that there was no equity in the property beyond FHA's claim. Therefore, he found that AG's lien was unsecured and the debtors were entitled to strip AG's lien against the residence.[2] Presently pending before the Court is AG's appeal of the Bankruptcy Court's decision.

### STANDARD OF REVIEW

■ In reviewing a decision of a bankruptcy court, the district court must accept the bankruptcy judge's findings of fact unless they are clearly erroneous. Fed.Bankr.R. 8013; *In re Chase & Sanborn Corp.*, 904 F.2d 588, 593 (11th Cir.1990). A bankruptcy court's conclusions of law, on the other hand, are subject to *de novo* review. *Id.*

### DISCUSSION

■ The issue raised in this appeal is whether § 1322(b)(2) of the Bankruptcy Code permits the debtors to treat AG as wholly unsecured pursuant to § 506(a) and thus avoid AG's mortgage lien.

Under Chapter 13 of the Bankruptcy Code, debtors may adjust their debt through a repayment plan approved by the Bankruptcy Court. Section 506(a) limits a creditor's secured claim to the value of its collateral:

An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property

... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim.

11 U.S.C. § 506(a). This section normally allows a debtor to divide a creditor's claims into secured and unsecured components according to the value of the collateral. To the extent that a secured creditor holds a claim in excess of the value of the property, that surplus is deemed to be unsecured. Section 1322(b)(2) allows debtors to modify the rights of both secured and unsecured creditors, but the section provides a special protection for creditors whose claims are secured only by a lien on the debtor's principal residence. Section 1322(b)(2) states that a plan may "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims." 11 U.S.C. § 1322(b)(2).

In *Nobelman v. American Savings Bank*, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993), a unanimous Supreme Court settled the conflict between § 1322(b)(2) and § 506(a) and addressed whether a debtor could divide a creditor's claim into secured and unsecured components if the claim was secured only by the debtor's principal residence. In *Nobelman*, the debtors had a first mortgage on their residence of approximately $71,000, while the parties stipulated that the value of the residence was merely $23,500. The debtors proposed to make payments on the mortgage only up to the value of the residence and treat the remainder of the claim as unsecured. The creditor objected, arguing that bifurcating the claim into secured and unsecured claims would violate § 1322(b)(2). The debtors, on the other hand, argued that the protection of § 1322(b)(2) applies only to the extent that the creditor held a secured claim in the residence.

---

creased, and when the debtors filed for bankruptcy protection, the amount of debt owed to FHA was $59,889.74.

**2.** Lien stripping occurs when a debtor avoids the lien of a lender who's claim is unsecured.

The Court held that § 1322(b)(2) prohibited the debtor from stripping the creditor's claim, because although it was undersecured, it was still a secured claim to the extent of the value of the property. The Court stated that it was appropriate for the debtors to look to § 506(a) to determine the status of the creditor's secured claim; but, even though the portion of the creditor's claim that exceeded the value of the collateral would be considered unsecured under § 506(a), it did not mean that the rights that the creditor enjoyed as a mortgagee were limited by the valuation of its secured claim. *Id.*, 508 U.S. at 329, 113 S.Ct. at 2110. The Court interpreted the statement in § 1322(b)(2) that a plan may "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence," as not applying exclusively to those claims that are secured pursuant to valuation under § 506(a). The debtors had argued that because the clause prohibiting modification of homestead liens came immediately after the term "secured," that Congress intended for only secured claims, as opposed to unsecured claims, to be protected by § 1322(b)(2). The Court rejected this argument and found that, while such a reading of the statute was sensible, it was not compelled. Instead of using the phrase "claim secured ... by," Congress could have repeated the term "secured claim." *Nobelman,* 508 U.S. at 330–31, 113 S.Ct. at 2110–11. By choosing not to use the term of art "secured claim," the Court inferred that Congress intended to use the term "claim" in the ordinary sense, defined by the Bankruptcy Code as including any "right to payment, whether ... secured or unsecured." 11 U.S.C. § 101(5). Based on this reasoning, the Court found it plausible to read the phrase prohibiting modification of homestead liens "as referring to the lienholder's entire claim, including both the secured and unsecured components of the claim." *Id.* at 331, 113 S.Ct. at 2111. Justice Stevens wrote a concurring opinion, noting that the apparent conflict in the Code sections was explained by the legislative history of § 1322(b)(2), which reveals that the favorable treatment of residential lenders was intended to encourage the flow of capital into the home lending market. *Id.* 508 U.S. at 332, 113 S.Ct. at 2111–12. Essentially, then, Congress intended for § 1322(b)(2) to trump § 506(a) with respect to homestead liens.

In the case at bar, unlike *Nobelman,* where the secured creditor had at least a partially secured claim, AG's lien is wholly unsecured, because the debtors have no equity in the subject property over and above the amount of FHA's mortgage. *Nobelman* did not address this situation. Since *Nobelman,* numerous bankruptcy courts have reached opposite conclusions regarding whether *Nobelman*'s prohibition of stripping homestead liens applies to a wholly unsecured mortgage.

The majority view is that § 1322(b)(2) does not apply to holders of totally unsecured claims. *See e.g., In re Johnson,* 226 B.R. 364 (D.Md.1998); *In re Cerminaro,* 220 B.R. 518 (Bankr.N.D.N.Y.1998); *In re Yi,* 219 B.R. 394 (E.D.Va.1998); *In re Bivvins,* 216 B.R. 622 (Bankr.E.D.Tenn.1997); *In re Scheuer,* 213 B.R. 415 (Bankr.N.D.N.Y.1997); *In re Cervelli,* 213 B.R. 900 (Bankr.D.N.J.1997); *In re Lam,* 211 B.R. 36 (9th Cir. BAP 1997); *In re Geyer,* 203 B.R. 726 (Bankr.S.D.Cal. 1996); *In re Geyer,* 203 B.R. 726 (Bankr. S.D.Cal.1996); *In re Sanders,* 202 B.R. 986 (Bankr.D.Neb.1996); *In re Purdue,* 187 B.R. 188 (S.D.Ohio 1995); *In re Wright,* 178 B.R. 703 (E.D.Va.1995); *In re Castellanos,* 178 B.R. 393 (Bankr.M.D.Pa.1994); *In re Mitchell,* 177 B.R. 900 (Bankr.E.D.Mo.1994); *In re Lee,* 177 B.R. 715 (Bankr.N.D.Ala.1995); *In re Thomas,* 177 B.R. 750 (Bankr.S.D.Ga. 1995); *In re Woodhouse,* 172 B.R. 1 (Bankr. D.R.I.1994); *In re Sette,* 164 B.R. 453 (Bankr.E.D.N.Y.1994); *In re Lee,* 161 B.R. 271 (Bankr.W.D.Okla.1993); *In re Kidd,* 161 B.R. 769 (Bankr.E.D.N.C.1993); *In re Williams,* 161 B.R. 27 (Bankr.E.D.Ky.1993); *In re Hornes,* 160 B.R. 709 (Bankr.D.Conn. 1993); *In re Plouffe,* 157 B.R. 198 (Bankr. D.Conn.1993). The courts in favor of allowing modification of an unsecured mortgage rely on *Nobelman's* statement that it is appropriate to look to § 506(a) for valuation of the collateral to determine the status of the creditor's claim. 508 U.S. at 328–29, 113 S.Ct. at 2106. These courts have interpreted this language to mean that they must first

determine whether the creditor's claim is secured or unsecured according to § 506(a). If the claim is unsecured, then the protections of § 1322(b)(2) do not apply and the debtor may strip the lien. These courts focus on the distinction between the creditor's partially secured claim in *Nobelman* and the wholly unsecured claims of the debtors before them. This is the view that Judge Hershner adopted and the rationale on which the debtors rely in this appeal.

The minority view is that homestead lienholders' rights may not be stripped, even if their claims are wholly unsecured. *See e.g., In re Tanner,* 223 B.R. 379 (Bankr.M.D.Fla. 1998); *In re Lewandowski,* 219 B.R. 99 (Bankr.W.D.Pa.1998); *In re Bauler,* 215 B.R. 628 (Bankr.D.N.M.1997); *In re Shandrew,* 210 B.R. 829 (Bankr.E.D.Cal.1997); *In re Fraize,* 208 B.R. 311 (Bankr.D.N.H.1997); *In re Barnes,* 207 B.R. 588 (Bankr.N.D.Ill.1997); *In re Barnes,* 199 B.R. 256 (Bankr.W.D.N.Y. 1996); *In re Neverla,* 194 B.R. 547 (Bankr. W.D.N.Y.1996); *In re Johnson,* 160 B.R. 800 (S.D.Ohio 1993). These courts place emphasis on the existence of a lien rather than the value of the property which is the subject of the lien. They rely on *Nobelman's* holding that the term "claim" as used in § 1322(b)(2) encompasses the right to payment, whether secured or unsecured. 508 U.S. at 331, 113 S.Ct. at 2111. This is the view on which AG relies in this appeal.

The Eleventh Circuit has not addressed the conflicting applications of *Nobelman* and § 1322(b)(2), and there is a split of authority among the bankruptcy courts in the Eleventh Circuit. Two leading bankruptcy treatises also take opposing views. *See* Lundin, Keith M., Chapter 13 Bankruptcy, 2nd Edition, § 4.46, p. 4–56 (concluding that the protection of § 1322(b)(2) extends to the wholly unsecured lienholder); 5 Collier on Bankruptcy, § 1322.06[1][a] at 1322–16 (L. King 15th Ed.) (adopting view that if a lien is completely unsecured, then it is not protected by § 1322(b)(2)). Since there is no binding authority on the issue and since this Court reviews issues of law *de novo,* this Court must choose between the two conflicting views. The Court sides with the line of authority prohibiting modification of liens se-

cured only by the debtor's principal residence regardless of whether the claim is wholly unsecured, because the Court finds that this position is compelled by *Nobelman* and that it is the more reasoned approach.

It is clear from *Nobelman* and the language in the statute itself that Congress intended § 1332(b)(2) to protect all claims which are secured only by a lien on the debtor's principal residence. Section 1322(b)(2) states that a bankruptcy plan may "modify the rights of holders of secured claims, other than *a claim secured only by* a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims...." 11 U.S.C. § 1322(b)(2) (emphasis added). As the *Nobelman* Court found, in the clause prohibiting modification of homestead liens, Congress could have repeated the term of art "secured claim," but it chose to use the phrase "a claim secured ... by" instead. The chosen language does not specify that the claim must be secured by a certain level of equity in the underlying collateral. Rather, the only requirement is that the claim is secured by the debtor's principal residence. Thus, the emphasis in the statute is on the fact that a lien exists on the property, not the value of such property.

Because Congress used both the phrases "holders of secured claims" and "holders of unsecured claims" in § 1322(b)(2) but placed the clause prohibiting the modification of homestead liens after the phrase "holders of secured claims" only, it certainly is reasonable to infer that Congress intended to protect only secured claims from lien stripping. However, the Supreme Court rejected this very argument in *Nobelman.* All criticism of *Nobelman* aside, the Supreme Court's holding is clear that § 1322(b)(2)'s protection applies to all claims secured only by the debtor's principal residence, whether they are secured or unsecured. Therefore, its protection applies to AG's claim in the case at bar, even though it would be considered unsecured under a § 506(a) valuation.

This result is logical. Under the majority view, if the remaining value of the subject property (after accounting for the senior lienholder's claim) is merely one cent more than the amount of the junior mortgage, then the

junior creditor would be deemed secured and thus protected under § 1322(b)(2), while those junior mortgagees who lack that penny of equity would have their claims stripped. This would place too much emphasis on the valuation process, which is inexact and is subject to fluctuations in the market. Such a result is contrary to *Nobelman*, because there, the Supreme Court did not require any level of equity for § 1322(b)(2) protection.

Moreover, the majority view does not recognize that the existence of a lien carries any rights if the lien is unsecured. This view essentially holds that if a lien has no security to support it, the rights afforded a lienholder are meaningless, because a forced sale would not result in any financial gain to the lienholder. While this view is legitimate, it completely ignores *Nobelman's* emphasis on the existence of a lien rather than the presence of value in the property supporting the lien. *Nobelman,* 508 U.S. at 329–31, 113 S.Ct. at 2110–11. The *Nobelman* Court recognized that the rights given to the holder of a lien by a mortgage contract and state law are important in and of themselves, without regard to the value of the collateral used to secure those rights. *Id.* And, the Supreme Court does not think that those rights should be displaced by the Bankruptcy Code absent an indication to that effect by Congress. *Id.* It may seem unfair that a creditor that normally would not have an allowable secured claim under § 506(a) would be protected from lien stripping under § 1322(b)(2); but, according to *Nobelman,* Congress's intent in passing § 1322(b)(2) was to give homestead lienholders something that they otherwise would not be entitled to under § 506(a).

For the foregoing reasons, the Court hereby adopts the view espoused by the bankruptcy courts that hold that § 1322(b)(2)'s protection applies to a claim secured only by a lien on the debtor's primary residence regardless of whether such lien would be secured or unsecured under § 506(a). Under the facts now before the Court, AG would qualify for such protection. Accordingly, to the extent that the Bankruptcy Court held otherwise, such decision is hereby **REVERSED** and the case is hereby **REMANDED** for proceedings consistent with this Order.