**In re Monta J. CALLANDER, Gail R. Callander, Debtors.**

**No. 00–60801.**

United States Bankruptcy Court, S.D. Ohio, Eastern Division.

May 9, 2001.

Monta J. Callander, Gail R. Callander, Columbus, Ohio, William A. Semons, Columbus, Ohio, for debtors.

Frank M. Pees, Worthington, Ohio, for Chapter 13 Trustee.

HomeComings Financial Network, Blue Bell, PA, Tracey M. Johnson, Lerner, Sampson & Rothfuss, Cincinnati, Ohio, for HomeComings Financial Network.

### ORDER OVERRULING OBJECTION TO CONFIRMATION

DONALD E. CALHOUN, Jr., Bankruptcy Judge.

This case is before the Court upon the objection by HomeComings Financial Network ("HomeComings") to confirmation of the debtors' plan of reorganization. The issue is whether a plan of reorganization can be confirmed over objection by a creditor who holds a second mortgage on the debtors' residential real estate, where the value of the real estate is less than the claim of the first mortgage holder, and the plan treats the second mortgage as an unsecured nonpriority debt, and requires the second mortgage to be released upon completion of the plan. This Court holds that such a plan may be confirmed.

### I. FINDINGS OF FACT

Monta and Gail Callander ("Debtors") filed a petition for relief under Chapter 13 of the Bankruptcy Code on November 24, 2000. In Schedule A, the Debtors listed the value of their principal residence

("Residence") at $60,000.00. On January 2, 2001, Old Kent Mortgage Services filed a proof of claim for $61,720.81, secured by a first mortgage on the Debtors' Residence. On January 25, 2001, HomeComings filed a proof of claim for $34,950.91, secured by a second mortgage on the Debtors' Residence.

The Debtors submitted an amended plan of reorganization ("Plan") on February 2, 2001. In the Plan, the Debtors attempt to "strip off" HomeComings' lien on the Residence. "The term 'strip off' is colloquially used when, there being no collateral value for a mortgage, the entire lien is proposed to be avoided." *In re Mann*, 249 B.R. 831, n. 1 (1st Cir. BAP 2000).

At the confirmation hearing on March 1, 2001, Mr. Bruce Gosney, a licensed real estate appraiser who had appraised the Residence at the Debtors' request, testified that the value of the Debtors' Residence was $60,000.00. Mr. Gosney's credentials and method of appraisal were unchallenged by HomeComings. Further, HomeComings did not present any evidence of its own, nor cross-examine the Debtors' expert.

Value of the collateral is an essential factual issue. Resolution of the legal issue before the Court hinges directly on the role the value of the collateral plays in the interpretation of two Bankruptcy Code sections and in the application of an important U.S. Supreme Court decision. If the value of the collateral is sufficient to secure even $1.00 of HomeComings' claim, the result reached by the Court would be entirely different. However, HomeComings' in its memorandum supporting its opposition to confirmation and in its pre-sentation at the confirmation hearing did not controvert the Debtors' evidence as to the value of the Residence. Therefore, based on the uncontroverted evidence submitted by the Debtors, the Court finds that the value of the Debtors' Residence is $60,000.00.

## II. *STATUTORY AUTHORITY*

Section 506(a) of the Bankruptcy Code provides, "[a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim."[1] 11 U.S.C. § 506(a).

Section 1322(b)(2) of the Bankruptcy Code allows a Chapter 13 plan to "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence ..."[2] 11 U.S.C. § 1322(b)(2).

## III. *NOBELMAN*

In *Nobelman v. American Sav. Bank*, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993), the Supreme Court addressed whether, in a Chapter 13 case, an undersecured claim secured only by a mortgage on a debtor's principal residence may be bifurcated into its secured and unsecured components. Where a plan proposes to pay a claim as secured only to the extent of the value of the collateral, with the remainder of the claim proposed to be paid

---

1. Determining a claim's secured, unsecured, or undersecured status based upon the collateral's value is generally referred to as a § 506(a) valuation.

2. The portion of § 1322(b)(2) that prohibits a debtor from modifying the rights of a claimant who holds a security interest in real property that is the debtor's principal residence is referred to as the "anti-modification" clause.

as an unsecured, nonpriority debt, such treatment is colloquially referred to as a lien "strip down." *Nobelman* made it clear that lien strip downs are not permitted. Not specifically addressed in *Nobelman*, however, is whether a claimant may be treated as wholly unsecured where, as here, there is no equity whatsoever to which the claimant's otherwise valid security interest could attach, after a § 506(a) valuation.

If *Nobelman* controls the interpretation of § 1322(b)(2)'s anti-modification clause here, HomeComings' claim must be treated as secured despite the Court's § 506(a) valuation. If *Nobelman* does not control the interpretation of § 1322(b)(2) here, then HomeComings may be treated as wholly unsecured because there is no equity in the Residence to secure HomeComings' lien, after a § 506(a) valuation. Naturally, HomeComings asks this Court to apply the holding in *Nobelman* regardless of the value of the Residence. The real question becomes whether *Nobelman* should apply in a situation, like here, where the value of the Residence is insufficient to provide any equity to which the junior lienholder's security interest can attach.

## IV. CASELAW

Research on this question reveals a notable split among courts to have addressed this issue, with a majority willing to distinguish *Nobelman* and allow a wholly unsecured junior mortgage to be stripped off. *See, In re McCarron,* 242 B.R. 479 (Bankr. W.D.Mo.2000); *In re Flowers,* No. 98–11492, 1999 WL 118022 (Bankr.E.D.Va. 1999); *Johnson v. Asset Management Group, LLC (In re Johnson),* 226 B.R. 364 (D.Md.1998); *In re Perugini,* 234 B.R. 247 (Bankr.D.Conn.1999); *In re Phillips,* 224 B.R. 871 (Bankr.W.D.Mich.1998); *In re Cerminaro,* 220 B.R. 518 (Bankr.N.D.N.Y.

1998); *In re Bivvins,* 216 B.R. 622 (Bankr. E.D.Tenn.1997); *In re Smith,* 215 B.R. 716 (Bankr.W.D.Tenn.1998); *In re Scheuer,* 213 B.R. 415 (Bankr.N.D.N.Y.1997); *In re Cervelli,* 213 B.R. 900 (Bankr.D.N.J.1997); *In re Geyer,* 203 B.R. 726 (Bankr.S.D.Cal. 1996); *In re Sanders,* 202 B.R. 986 (Bankr. D.Neb.1996); *Wright v. Commercial Credit Corp. (In re Wright),* 178 B.R. 703 (E.D.Va.1995), appeal dismissed without op., 77 F.3d 472 (4th Cir.1996) (unpublished table decision); *Vaillancourt v. Marlow (In re Vaillancourt),* 197 B.R. 464 (Bankr.M.D.Pa.1996); *Castellanos v. PNC Bank, N.A. (In re Castellanos),* 178 B.R. 393 (Bankr.M.D.Pa.1994); *In re Mitchell,* 177 B.R. 900 (Bankr.E.D.Mo.1994); *In re Lee,* 177 B.R. 715 (Bankr.N.D.Ala.1995); *In re Woodhouse,* 172 B.R. 1 (Bankr.D.R.I. 1994); *In re Sette,* 164 B.R. 453 (Bankr. E.D.N.Y.1994); *In re Hornes,* 160 B.R. 709 (Bankr.D.Conn.1993); *In re Moncrief,* 163 B.R. 492 (Bankr.E.D.Ky.1993); *In re Kidd,* 161 B.R. 769 (Bankr.E.D.N.C.1993); *In re Lee,* 161 B.R. 271 (Bankr.W.D.Okla. 1993); *In re German,* 258 B.R. 468 (Bankr. E.D.Okla.2001).

A significant minority of courts, however, have held that *Nobelman* should apply in situations like the one presented here, thus placing a wholly unsecured second mortgage holder's claim within the anti-modification clause of § 1322(b)(2). *See Green Tree Consumer Discount Co. v. Miller (In re Miller),* No. 99–13446DWS, 1999 WL 1052509 (Bankr.E.D.Pa.1999); *In re Cupp,* 229 B.R. 662 (Bankr.E.D.Pa. 1999); *In re Bauler,* 215 B.R. 628 (Bankr. D.N.M.1997); *In re Shandrew,* 210 B.R. 829 (Bankr.E.D.Cal.1997); *In re Fraize,* 208 B.R. 311 (Bankr.D.N.H.1997); *In re Barnes,* 207 B.R. 588 (Bankr.N.D.Ill.1997); *In re Barnes,* 199 B.R. 256 (Bankr. W.D.N.Y.1996); *In re Neverla,* 194 B.R. 547 (Bankr.W.D.N.Y.1996); and *In re Lane,* 248 B.R. 534 (Bankr.E.D.Tenn. 2000).

Courts within the Southern District of Ohio have also split on this question. *In re Perkins,* 237 B.R. 658 (Bankr.S.D.Ohio 1999) was factually similar to the instant case. In *Perkins,* the value of the senior mortgagee's claim was $45,387.95; the value of the property in question was established as $40,000.00; and the value of the junior mortgagee's claim was $19,458.22. The debtor attempted to strip off the junior mortgagee's lien using the modification power of § 1322(b)(2). The Court, however, would not allow it, writing, "[b]ased on the court's interpretation of § 1322(b)(2) and the Supreme Court's decision in *Nobelman,* the lien is protected from modification regardless of whether the lien would be wholly unsecured after a § 506(a) valuation." *Perkins,* 237 B.R. at 661.

*In re Purdue,* 187 B.R. 188 (S.D.Ohio 1995) was also factually similar to the instant case. There, the value of the debtor's residence was $32,500.00. Chase Mortgage, the senior mortgagee, had a claim of $34,827.81. Associates Financial Services Corporation, the junior mortgagee, had a claim of $5,818.64. Therefore, as in this case, the junior mortgagee's claim was wholly unsecured after a § 506(a) valuation. The District Court, in affirming the Bankruptcy Court's decision, declined to apply *Nobelman.* After pointing out that *Nobelman* involved a claim with a secured component, the Court reasoned, almost syllogistically, "Associates' claim does not include a secured claim component. The value of Debtor's principal residence is less than Chase Mortgage's claim. No portion of Associates' security interest is supported by value in the collateral. Accordingly, pursuant to 11 U.S.C. 506(a), Associates' claim is a wholly unsecured claim. Section 1322(b)(2) permits a debtor, without limitation, to modify the rights of holders of unsecured claims." *Purdue* 187 B.R. at 190.

## V. HOLDING

■ This Court today adopts the majority position, and holds that, where § 506(a) valuation establishes that there is no equity to which a junior lienholder's security interest can attach, the junior lienholder's rights are not protected by § 1322(b)(2)'s anti-modification clause. Accordingly, a plan of reorganization which proposes to treat such a creditor as wholly unsecured may be confirmed. Given the impact of this holding and the extent of the split in authority, further discussion of the factors this Court finds persuasive is warranted.

### A. STATUTORY INTERPRETATION

■ Principles of statutory interpretation provide strong support for the majority position, which allows a wholly unsecured lien such as HomeComings' to be stripped off. Given a choice between two equally plausible statutory interpretations, a court should choose the interpretation which gives effect to the whole statutory scheme. *See, e.g., Kawaauhau v. Geiger,* 523 U.S. 57, 61, 118 S.Ct. 974, 976, 140 L.Ed.2d 90 (1998) ("[W]e are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law." [citation omitted]). Adopting the position advanced by HomeComings would render § 506(a) superfluous where a claim, supported by a security interest in the debtor's principal residence, is actually wholly unsecured after a § 506(a) valuation. Declining to apply *Nobelman* to these facts, however, permits the Court to construe § 506(a) and § 1322(b)(2) in harmony. Such an analysis gives meaning to a determination of the collateral's value under § 506(a), and remains true to § 1322(b)(2) because a claimant whose security interest in a debtor's principal residence enjoys no value to which it can attach, is not, in reality, a secured claimant. An unsecured

claimant's rights can be modified without nullifying the anti-modification clause in § 1322(b)(2), because, in light of *Nobelman*, § 1322(b)(2)'s anti-modification clause still operates to protect a claim with a secured component.

Indeed, the beauty of *Nobelman* is that it interprets the Bankruptcy Code so as to render neither § 506(a) nor § 1322(b)(2) superfluous. An explanation of the history of *Nobelman* helps illustrate this point. Before *Nobelman*, the majority position allowed debtors to strip down liens in a Chapter 13 case, effectively eviscerating the anti-modification clause in § 1322(b)(2). In *In re Nobleman*, 968 F.2d 483 (5th Cir.1992), the Fifth Circuit, following the then-minority position, held that such a strip down was not allowed, and determined there was a conflict between § 506(a) and § 1322(b)(2). In resolving this conflict, the Fifth Circuit decided that § 1322(b)(2) required courts to ignore § 506(a) where a creditor held a security interest in the debtor's principal residence, regardless of whether there was equity to which the security interest could attach. Based on this reasoning, the Fifth Circuit held that Chapter 13 debtors could not bifurcate such a claim into its secured and unsecured components and then attempt to modify that claim using § 1322(b)(2). In other words, the Fifth Circuit held that a claim secured even in part by an interest in a debtor's principal residence fell within § 1322(b)(2)'s anti-modification clause and could not be stripped down because § 1322(b)(2)'s anti-modification clause rendered § 506(a) inapplicable to such a claim.

The Supreme Court, however, while upholding the conclusion that a strip down is not allowed, expressly rejected the Fifth Circuit's resolution of the conflict it perceived between §§ 506(a) and 1322(b)(2). As Justice Thomas explained, "Petitioners were correct in looking to § 506(a) for a judicial valuation of the collateral to determine the status of the bank's secured claim." *Nobelman*, 508 U.S. at 328, 113 S.Ct. 2106. That is, rather than finding that § 1322(b)(2) renders § 506(a) a nullity, the Supreme Court emphasized the necessity of determining, through § 506(a), whether there is a secured claim at all. Because there was a secured component to the claim after a § 506(a) valuation, the bank's rights in *Nobelman* were determined to come within § 1322(b)(2)'s anti-modification clause. In this manner, the Supreme Court was able to resolve whether a lien strip down was allowed in a Chapter 13 without rendering either § 506(a) or § 1322(b)(2) superfluous.

## B. *CREDITORS' RIGHTS*

Application of *Nobelman's* analysis of creditors' rights also lends strong support to the majority position. Justice Thomas, writing for a unanimous Court, relied heavily on analyzing the rights enjoyed by a secured party in determining that the anti-modification clause of § 1322(b)(2) prevented a strip down in a Chapter 13 case. "The bank's 'rights' . . . are reflected in the relevant mortgage instruments which are enforceable under Texas law. They include the right to repayment of the principal in monthly installments over a fixed term at specified adjustable rates of interest, the right to retain the lien until the debt is paid off, the right to accelerate the loan upon default and to proceed against petitioners' residence by foreclosure and public sale, and the right to bring an action to recover any deficiency remaining after foreclosure." *Nobelman*, 508 U.S. at 329, 113 S.Ct. 2106.

Likewise here, HomeComings bargained for certain rights, enforceable under state law. However, as explained in *In re Lam*, 211 B.R. 36 (9th Cir. BAP 1997), "[a]n

analysis of the state law 'rights' afforded a holder of an unsecured 'lien,' if such a situation exists, indicates these rights are empty rights from a practical, if not a legal, standpoint. A forced sale of the property would not result in any financial return to the lienholder, even if a forced sale could be accomplished where the lien attaches to nothing. Nothing secures the 'right' of the lienholder to continue to receive monthly installment payments, to retain the lien until the debt is paid off, or the right to accelerate the loan upon default, if there is no security available to the lienholder to foreclose on in the event the debtor fails to fulfill the contract payment obligations." *Lam*, 211 B.R. at 40. Stated bluntly, where the value of given collateral is insufficient to afford a creditor's security interest anything to which it can attach, the creditor's rights as set forth in the relevant security agreements are meaningless.

### C. *FACTUAL DISTINCTION OF NOBELMAN*

This Court cannot ignore the significant difference between the instant facts and those of *Nobelman*. The value of the collateral in *Nobelman* was sufficient to provide some anchor for the security interest in question. Here there is no question that HomeComings' lien enjoys no such purchase. *Nobelman's* facts gave rise to a concern that the debtor was trying to turn one claim into two, as language from *Nobelman* illustrates. "The bank's contractual rights are contained in a unitary note that applies at once to the bank's overall claim, including both the secured and unsecured components. Petitioners cannot modify the payment and interest terms for the unsecured component, as they propose to do, without also modifying the terms of the secured component." *Nobelman*, 508 U.S. at 331, 113 S.Ct. 2106. Here, the Debtors have proposed a plan that accurately reflects reality and which appropriately treats HomeComings' entire claim as unsecured.

### D. *APPELLATE AUTHORITY*

The majority position is in keeping with the trend in the Circuit Courts of Appeal and Bankruptcy Appellate Panels. Of the Circuit Courts and Bankruptcy Appellate Panels to have addressed the issue, all have adopted the position taken today. For example, in *In re Mann*, 249 B.R. 831 (1st Cir. BAP 2000), the United States Bankruptcy Appellate Panel for the First Circuit, in perhaps one of the more thorough analyses of the issue, "decline[d] to read *Nobelman* as mandating better rights for unsecured creditors holding a document purporting to be a residential real property Mortgage than for unsecured creditors without." *Mann*, 249 B.R. at 840.

*In re Lam*, 211 B.R. 36, 41 (9th Cir. BAP 1997), *appeal dismissed*, 192 F.3d 1309 (9th Cir.1999), held that "[t]he *Nobelman* decision holding that section 1322(b)(2) bars a chapter 13 plan from modifying the rights of holders of claims, secured only by the debtor's principal residence, does not apply to holders of totally unsecured claims." In *In re McDonald*, 205 F.3d 606, 615 (3rd Cir.2000), *cert. denied*, 531 U.S. 822, 121 S.Ct. 66, 148 L.Ed.2d 31 (2000), the Third Circuit held "that a wholly unsecured mortgage is not subject to the antimodification clause in § 1322(b)(2)." Similarly, in *In re Bartee*, 212 F.3d 277, 296 (5th Cir.2000), *rehearing and rehearing en banc denied*, 228 F.3d 411 (Table) (5th Cir.(Tex.) July 18, 2000) (No. 99–20463), the Fifth Circuit held "that a wholly unsecured mortgage is not subject to the antimodification clause in § 1322(b)(2)." In *In re Tanner*, 217 F.3d 1357, 1360 (11th Cir.2000), the Eleventh Circuit held that, "[t]he better reading of

§ 506(a) and § 1322(b)(2) ... protects only mortgages that are secured by some existing equity in the debtor's principal residence."

### E. *A BRIGHT LINE*

In *In re Dickerson*, 222 F.3d 924 (11th Cir.2000), *cert. denied*, —— U.S., ——, 121 S.Ct. 1604, 149 L.Ed.2d 470 (2001), the Eleventh Circuit, while declining to deviate from its prior decision in *Tanner, supra*, expressed second thoughts. "[W]ere we to decide this issue on a clean slate, we would not so hold. We find persuasive the district court's reasoning that providing 'anti-modification' protection to junior mortgagees where the value of the mortgaged property exceeds the senior mortgagee's claim by at least one cent, as prescribed by the Supreme Court's decision in *Nobelman* [citation omitted], but denying that same protection to junior mortgagees who lack that penny of equity, places too much weight upon the valuation process." *Dickerson*, 222 F.3d at 926.

The Third Circuit, however, had addressed this concern a few months earlier in *McDonald*. "Bright-line rules that use a seemingly arbitrary cut-off point are common in the law. A day beyond the statute of limitations and the plaintiff must lose, even if the claim was otherwise unquestionably a winning one. If the evidence is just over a preponderance, the plaintiff wins full damages; just under, the plaintiff gets nothing. In bankruptcy law a Chapter 7 trustee cannot contest the validity of a debtor's claimed exemption when the 30–day period for objecting has expired and the trustee failed to obtain an extension; and this is true even if the debtor has no colorable basis for claiming the exemption [citation omitted] ... What these examples show is that line drawing is often required in the law and, at the boundary, the appearance of unfairness is unavoidable. Simply pointing out that some arbitrariness occurs is not a compelling objection." *McDonald*, 205 F.3d at 613. This Court agrees with the Third Circuit and finds that concern over any perceived arbitrariness in the majority position is not well founded.

### F. *FAIRNESS*

Today's ruling should not prove too onerous a burden on junior mortgagees, and, in fact, focuses the contest on the appropriate issue: the value of the collateral. Where a junior mortgagee wishes to press its demand to be treated as a secured claimant, it will have, through the confirmation process, ample opportunity to offer evidence of value, just as debtors will. This renders the playing field level, and the game fair.

### VI. *CONCLUSION*

This Court holds that where a § 506(a) valuation establishes that there is no equity to secure a junior mortgagee's lien, a plan of reorganization that proposes to treat such a creditor as wholly unsecured may be confirmed. This holding is supported by the majority of decisions that have addressed the interplay of § 506(a), § 1322(b)(2), and the principles of *Nobelman*. Further, such a conclusion is supported by sound principles of statutory interpretation, and does not prejudice the rights of creditors.

Accordingly, HomeComings' objection to confirmation of the Plan is **OVERRULED**. The Debtors' Plan will be confirmed pursuant to a separate order.

IT IS SO ORDERED.